# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01012-COA

**JEREMY WALKER A/K/A JEREMY JEROME WALKER**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/2021 |
| TRIAL JUDGE: | HON. JOHN R. WHITE |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/10/2025 |
| MOTION FOR REHEARING FILED: | |

### BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     Jeremy Walker appeals from his conviction of manslaughter in the Alcorn County Circuit Court.  He argues that plain error occurred at trial when a police investigator was allowed to give opinion testimony that contradicted his theory of defense and that his counsel's assistance was so deficient that it undermined the outcome of the trial.  Finding no reversible error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     On May 19, 2015, Tarvio Walker was having a cookout at his apartment on Wilson Street in Alcorn County to celebrate his birthday.  Tarvio had worked that day painting a

house with Michael Decker. When they got done, Tarvio asked Decker to come to his apartment because they had not yet been paid, and he wanted to make sure Decker got paid. Tarvio invited Decker to stay for the cookout. They started cooking around 2 p.m. Tarvio's cousin, Jeremy Walker, lived in the same apartment complex in a building across a small parking lot from Tarvio's apartment.

¶3. Tarvio testified at trial that around 7:30 p.m., Walker came out of his apartment, and Walker and Decker "exchanged words and they had a fight." Tarvio said he had no prior knowledge of a dispute between the two men, and he believed the fight started because of comments they were making about "one of them snitch on each other or something." Tarvio witnessed Walker and Decker fight on three separate occasions that night. Tarvio testified that during the first two fights, Decker picked up Walker and threw him down onto his shoulder. Tarvio and others were able to break up the first two fights. After the fights were broken up, Decker would "go back and s[i]t in the chair and [Walker] would go back over to the house and they would have verbal words," shouting at each other across the parking lot.

¶4. Tarvio testified that "[Walker] called [Decker] out there—called him back the third time." During the third fight, Tarvio saw Decker pick up Walker again, but as Decker was about to throw Walker down, "something stopped him." Tarvio testified that when the third fight happened, "I was over there cooking and Michael Decker, he fell on me and was bleeding out the mouth." Tarvio called 911. Walker got in his vehicle and left.

¶5. Corinth Police Officer Skyler Gammill responded to the 911 call. He found Decker

2

lying on the ground, gasping for breath and unable to speak. Gammill was informed that Decker had been stabbed, and the suspect, Walker, had left the scene in a green Ford Expedition. He found no weapon on or near Decker. He informed other officers to be on the lookout for the suspect and a green Expedition. He later went to the hospital to speak to Decker, but Decker was intubated and unable to speak. Decker died several days later.

¶6.     Corinth Police Officer Shane Stegall testified that he arrived after Decker had been taken to the hospital and secured the crime scene. Based on information from witnesses that Walker threw a knife over a fence at the apartment complex, Stegall and another officer went to the area and found a bloody knife in an overgrown lot on the other side of a fence.

¶7.     Detective Jerry Mayhall testified that he was four or five blocks away from the scene when he saw a green Expedition headed in the opposite direction of the Wilson Street apartments. Mayhall directed the vehicle's driver (Walker) to pull over, and he complied. When Mayhall approached the vehicle, he saw Walker in the driver's seat, and he observed blood on Walker's face and shoes. Walker was taken into custody.

¶8.     Detective Dell Green interviewed Walker later that night. Green testified that he did not observe any injuries on Walker, and Walker did not complain of any injuries or pain. After waiving his *Miranda*[1] rights, Walker told Green that "Decker was kind of on his side of the apartment complex and that Decker was antagonizing him that afternoon[,] and ultimately it escalated to the point where they got into a physical altercation." When Green asked Walker about the details of the altercation, Walker replied that "he had blacked out and

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

couldn't actually go into the actual details." However, as the interview went on, Walker began to recount details, and when he was "presented with contradictory facts or circumstances," he "would adjust his story." Walker initially described the fight as "licks" and "a tussle," and he told Green that there were "no problems" between Decker and him. Later, though, Walker told Green that Decker had "snitched" on him and stated that the last time he saw Decker was "years" earlier when Decker had come to his house at 2 or 3 a.m., "banging on [his] door," and Walker told him to leave.

¶9.    When questioned about the knife, Walker denied that he carried a knife or had one on him during the incident with Decker. But when Green told him that a knife was found at the scene, Walker admitted that he "always carries a knife," and he said that he threw the knife over the fence at the apartment complex before he left the scene. At the time of Walker's interview, it was presumed that Decker would recover and that Walker would be charged with aggravated assault. However, after Decker died in the hospital, Walker was indicted and tried for first-degree murder. The audio recording of Walker's interview was played for the jury.

¶10.   Dr. Mark LeVaughn with the State Medical Examiner's Office testified that Decker's cause of death was four stab wounds to the left side of his chest, one of which penetrated four to six inches deep and pierced his left heart ventricle, and the manner of death was homicide. Dr. LeVaughn testified that Decker was six feet four inches tall and approximately 166 pounds at the time of his death.

¶11.   Walker testified in his own defense. He testified that on May 19, 2015, he slept until

4

4 or 4:30 p.m. because he had worked the night shift the previous night. After he woke up, he went to the store, and when he returned, he sat in his truck listening to music in the small parking lot between his apartment and Tarvio's apartment. He saw people outside barbequing. Walker testified, "Tarvio Walker come over to my truck wanted to talk about the boy want to fight you and all this and that, you know, instigated all that." Walker told him, "Tarvio get away from my truck. . . . I don't want to fight the boy." Tarvio went and sat back down, and they "got to talking about" Walker, but Walker "didn't pay no mind."

¶12. Walker testified that Tarvio and Decker then came "running over" to his truck, but others "grabbed [Decker]." Although Tarvio testified that there were three interactions between Walker and Decker, Walker testified that there were only two. Walker stated that when Decker came toward him a second time, "I got back out my truck, that's when we got to going at it, we got to tussling." Walker testified, "I literally did not want to fight him cause I got a hold on him. I'm telling them to grab him again cause they grabbed him the first time, they did not grab him the second time." Walker explained, "That's when we got to fighting a little bit. And he had me in a hold. He had me—he had my head."

¶13. Walker testified that he feared for his life because Decker, who was larger than him, was holding him "by [his] head" in "a tight squeeze," making it difficult for Walker to breathe, and Decker "was coming to [his] eyes at that time." Walker testified, "I know he was reaching for his knife or whatever . . . he had on him. I don't necessarily know, but I know I saw something black and silver." Walker stated, "I didn't know what he was reaching for cause I am scared for my life. That's when I came out with my knife to get him

5

up off me." Walker admitted that he left the scene after he stabbed Decker. However, he testified that he only left to go tell his mother what happened before she heard any "twisted" information from someone else.

¶14. In addition to Walker's testimony, the defense called two character witnesses who both testified that Walker had a good reputation in the community. The defense then rested.

¶15. The jury was instructed on the indicted charge of first-degree murder, as well as the lesser-included offense of manslaughter. The jury was instructed that it should find Walker guilty of manslaughter if it found that he stabbed Decker with a deadly weapon "in the heat of passion" and "not in necessary self-defense." The jury was also instructed that Walker was guilty of manslaughter rather if "Walker stabbed [Decker] acting with an actual genuine belief that the killing was necessary in order to protect himself from great bodily harm or death, but that belief was not reasonable under of the circumstances." The jury found Walker guilty of manslaughter.

¶16. On August 25, 2021, the circuit court sentenced Walker to twenty years in the custody of the Mississippi Department of Corrections, with twelve years suspended and eight to serve, and five years of post-release supervision. No post-trial motions or a notice of appeal was filed.

¶17. Over a year and a half later, on April 26, 2023, Walker filed a pro se post-conviction motion in the circuit court for an out-of-time appeal and for appointment of counsel. Walker stated in the motion that his appointed trial counsel did not file a notice of appeal on his behalf, and he sought permission to proceed with an out-of-time appeal. While the motion

was pending, on August 8, 2023, Walker filed another pro se motion for an out-of-time appeal. He stated that he "sought an appeal," but his trial counsel "failed to perfect [his] appeal or seek a finding of indigency to assist with the costs of appeal and appointment of appellate counsel."

¶18. On August 22, 2023, the circuit court granted Walker's request and gave Walker thirty days to perfect his appeal. The circuit court found that Walker was indigent and appointed the Office of State Public Defender, Indigent Appeals Division, as counsel for appeal. Counsel with the Indigent Appeals Division then perfected this appeal. Walker raises two issues on appeal: (1) plain error occurred when Detective Green testified that he did not believe Walker acted in self-defense; and (2) his trial counsel was ineffective.

## DISCUSSION

### I. Detective Green's Testimony

¶19. At trial, Walker asserted that Decker continued to attack him even after Walker told him to stop, that he feared for his life, and that he stabbed Decker in self-defense. Walker argues that in "direct conflict" with his theory of defense, Detective Green was erroneously allowed to testify that based on his "professional opinion," this was not a self-defense case. Walker argues that whether he acted in self-defense was a question for the jury, and Green should not have been allowed to give an opinion in "direct conflict" with Walker's theory of defense. Walker argues that the error was compounded because Green's testimony was the last testimony the jury heard during the State's case-in-chief, and the State reiterated Green's testimony in its closing argument.

7

¶20.    Walker concedes that no objection was made to Green's testimony or the State's closing argument on this issue at trial, and he relies on the plain-error doctrine to assert error on appeal.  "Issues not presented to the trial court for lack of contemporaneous objection are procedurally barred, and error, if any, is waived." *Brady v. State*, 337 So. 3d 218, 227 (¶27) (Miss. 2022).  However, "[u]nder the plain error doctrine, this Court can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Manuel v. State*, 357 So. 3d 633, 637 (¶12) (Miss. 2023) (internal quotation marks omitted).

¶21.    We find no error, much less plain error, as to Green's testimony because Walker's counsel opened the door to the testimony.  "If a defendant opens the door to [a] line of testimony, ordinarily he may not complain about the prosecutor's decision to accept the benevolent invitation to cross the threshold." *McClusky v. State*, 359 So. 3d 673, 679 (¶22) (Miss. Ct. App. 2023) (quoting *Doby v. State*, 557 So. 2d 533, 539 (Miss. 1990)).

¶22.    On cross-examination, Walker's counsel asked Green, "Do you have any reason of your own personal knowledge to believe that this was not in the act of self-defense, your own personal knowledge?"  Green responded, "I do not believe it was self-defense."  On redirect examination, the State clarified and expanded on Green's testimony as follows:

> Q.    Okay.  Now, you were asked . . . based on your personal knowledge was this self-defense.  Now, as a detective, do you normally have personal knowledge of a crime in the sense that you're not ever there. Is that fair to say?
>
> A.    Yes.
>
> Q.    So the knowledge that you develop about cases is based on your

8

investigation and what that reveals; is that correct?

A. Correct.

Q. So it's not a personal knowledge, but a professional knowledge?

A. Correct.

Q. And that's based on your years of training and experience as a detective?

A. Yes.

Q. And your training both as a state certified investigator and through the FBI?

A. Correct.

Q. *Do you have a professional opinion based on your professional knowledge of this case was this self-defense?*

A. *No, it wasn't.*

[Q.]: No more questions.

(Emphasis added).

¶23. Walker cites *Roberson v. State*, 569 So. 2d 691 (Miss. 1990), in support of his argument that Green's testimony was plain error because it contradicted his defense. In *Roberson*, Marcus Roberson appealed his conviction of the armed robbery of a grocery-store cashier. *Id.* at 691-92. The cashier testified that during the robbery, Roberson put his hand on the counter and then removed cash from the register. *Id.* An investigating officer with several years' experience testified as a lay witness regarding the age of a fingerprint found on the counter. *Id.* Specifically, the officer testified that based on his observation of how quickly the fingerprint appeared when he dusted the counter, the fingerprint was made in

9

"probably the last hour." *Id.* at 695. The defense objected to the testimony because the officer had not been tendered as an expert. *Id.* The Mississippi Supreme Court agreed that the testimony was inadmissible. *Id.* The Supreme Court further found the error in admitting the testimony was not harmless because the officer's testimony directly contradicted the defense's theory that the defendant's fingerprint appeared on the counter because he had been in the store three to four hours before the crime. *Id.* at 696.

¶24. This case is distinguishable from *Roberson*. Green did not specifically testify why he believed Walker had not acted in self-defense, other than his general opinion based on his investigation of the crime. Further, the admission of Green's testimony was harmless given the other evidence presented at trial that contradicted Walker's theory of defense. The jury heard that Decker had "snitched" on Walker; that Walker was a willing participant in the altercation; that Walker "called [Decker] back out the third time"; that Walker exited his truck more than once to continue the fight; and that Walker stabbed Decker while Decker was unarmed. The jury also heard that Walker left the scene without checking on Decker and did not call 911 or tell the officer who stopped him that Decker needed medical attention, even though Walker knew either he or Decker had lost "a lot of blood," and officers observed no injuries on Walker.

¶25. Walker opened the door to Green's testimony, and "[a] defendant cannot complain on appeal about errors he invited." *Rubenstein v. State*, 941 So. 2d 735, 755 (¶53) (Miss. 2006). Further, given the other evidence at trial that contradicted Walker's theory of self-defense, the error, if any, was harmless. This issue is without merit.

10

## II.     Ineffective Assistance of Counsel

¶26.    "To succeed on an ineffective-assistance-of-counsel claim, the defendant must show that (1) his counsel's performance was deficient, and (2) that this deficiency prejudiced his defense." *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). "We look at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Dartez v. State*, 177 So. 3d 420, 423 (¶19) (Miss. 2015). "There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* This Court will find counsel's performance deficient "[o]nly where it is reasonably probable that, but for the attorney's errors, the outcome would have been different . . . ." *Id.*

¶27.    "Because appellate courts are limited to the trial record on direct appeal, 'generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings.'" *Bell*, 202 So. 3d at 1242 (¶12) (quoting *Dartez*, 177 So. 3d at 422-23 (¶18)). An ineffective-assistance claim will only be addressed on direct appeal where (1) "the record affirmatively shows ineffectiveness of constitutional dimensions," or (2) "the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* (quoting *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983)). This Court may also resolve such "claims on direct appeal when the record affirmatively shows that the claims are without merit." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).

¶28.    Walker argues that his trial counsel was ineffective for failing to give an opening

statement, failing to object to certain testimony, and failing to provide discovery or talk to witnesses. Walker also argues that his trial counsel's failure to file a notice of appeal should be considered in reviewing the totality of the circumstances regarding his counsel's effectiveness. The State declines to stipulate that the record is adequate to review these claims on the merits and asserts that this Court should dismiss Walker's claims without prejudice to Walker's right to raise the claims in a properly filed motion for post-conviction collateral relief. Alternatively, the State contends that the claims lack merit. We find that the record is sufficient to determine all but one of Walker's claims.

### 1.     Failure to Give an Opening Statement

¶29.    After counsel for the State made an opening statement at trial, Walker's counsel "request[ed] the opportunity to reserve the presentation of [his] opening statement until such time as [the defense] begin[s] [its] case in chief." The defense began its case-in-chief by calling Walker to the stand as its first witness. No mention was made of the absence of the defense's opening statement.

¶30.    "[T]he decision of whether to make an opening statement is a strategic one." *Golden v. State*, 968 So. 2d 378, 388 (¶38) (Miss. 2007) (quoting *Gilliard v. State*, 462 So. 2d 710, 716 (Miss. 1985)). Strategic decisions "will not rise to the level of ineffective assistance of counsel." *Id.* at (¶41). "[F]ailure to give an opening statement is not per se ineffective assistance of counsel." *Id.* at (¶38) (quoting *Branch v. State*, 882 So. 2d 36, 55 (¶38) (Miss. 2004)).

¶31.    Walker generally asserts that "an advocate should not miss any chance to persuade a

12

jury," but he does not allege he was prejudiced in any way by his counsel's decision to forego an opening statement. Walker was represented by two trial attorneys, both of whom gave closing statements on Walker's behalf at the conclusion of trial. Because Walker has not asserted that he was prejudiced by his counsel's decision not to give an opening statement, Walker has failed to demonstrate any ineffectiveness of counsel under this assignment of error. *Strickland*, 466 U.S. at 686 (stating that a counsel's alleged deficiency must have resulted in prejudice to the defense).

### 2. Failures to Object

#### a. Detective Green's Testimony

¶32. Walker incorporates his argument from Issue I and argues that his counsel was ineffective for failing to object to Green's testimony that Walker did not act in self-defense when he stabbed Decker. As explained above, even if allowing Green's testimony was error, the error was harmless given the other testimony at trial. Therefore, Walker cannot show that he was prejudiced by Green's testimony, even if his counsel should have objected.

¶33. Having found no reversible error as to Issue I, Walker's ineffective-assistance claim on this issue fails. *See Galloway v. State*, 122 So. 3d 614, 639 (¶52) (Miss. 2013) ("Having already concluded that no reversible error was present in [the witness's] testimony, we find that Galloway's ineffective-assistance-of-counsel claim with regard to [the witness's] testimony fails.").

#### b. Statement in Opening Argument Regarding Walker's Testimony

¶34. Walker argues that his counsel was ineffective for failing to object when the

13

prosecutor made a comment regarding whether Walker would testify at trial. Specifically, the prosecutor stated that the jury was "going to hear from him." Walker asserts that after this comment, he "had to testify."

¶35. The Fifth Amendment of the United States Constitution protects against self-incrimination, and Article 3, section 26 of the Mississippi Constitution likewise states that a defendant "shall not be compelled to give evidence against himself . . . ." *Leflore v. State*, 726 So. 2d 261, 263 (¶8) (Miss. Ct. App. 1998). Any comment by a prosecutor as to the defendant's failure to testify, even through "innuendo and insinuation," is reversible error. *Id.* "When there is a question as to the prosecution's comment on the defendant's failure to testify, each case must be considered individually on the facts of that particular case." *Id.* (quoting *De La Beckwith v. State*, 707 So. 2d 547, 584 (¶148) (Miss. 1997)).

¶36. In *Leflore*, this Court considered "[w]hether reversible error can be found in a prosecutor's contention that a defendant will testify . . . ." *Id.* The Court concluded there was no reversible error because the prosecution "merely mentioned the probability of Leflore testifying," and the circuit court instructed the jury to disregard the prosecutor's remark. *Id.* This Court further found that "[t]he fact that Leflore did actually testify with nothing in the record to indicate compulsion also does much to negate any claim of prejudice." *Id.* at 264 (¶9).

¶37. In the case at hand, taking the prosecutor's statement in context, we cannot find that the statement was an improper comment on whether Walker would testify. The prosecutor stated in opening:

14

I expect you're going to hear several things about this fight as the trial goes on. But the evidence I expect will show that the defendant described this entire fight as a little tussle. Those were his words, a little tussle. That they exchanged a few licks and that was it. *I expect that's what you're going to hear from him.*

(Emphasis added). In context, we find that the prosecutor was merely commenting on what the jury could expect to hear from the defense, not specifically whether Walker would take the stand. Walker gave an interview with law enforcement, and the audio of the interview was played for the jury by the State. On appeal, the State argues that the prosecutor could have been referring to what the jury would hear in Walker's interview, which the prosecution planned to play for the jury.

¶38. Regardless, Walker did testify in his own defense, and prior to doing so, the circuit court informed him of his right to remain silent and that the jury would be instructed that no inference or suggestion of guilt could be drawn from his decision not to testify. Walker responded, "I want to tell everything. I have nothing to hide, sir." *See id.* (holding that "[t]he fact that [the defendant] did actually testify with nothing in the record to indicate compulsion . . . does much to negate any claim of prejudice").

¶39. We cannot find that the prosecutor's statement was improper, and Walker has not shown any prejudice resulted from his counsel's decision not to object to the prosecutor's statement. Therefore, Walker's counsel did not render ineffective assistance by not objecting to the statement.

### c. Prior Crimes

¶40. Walker asserts that his trial counsel was ineffective for failing to object to the mention

15

of other crimes. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1).

¶41. First, Walker asserts that his counsel should have objected to the State's reference to Walker or Decker "snitching" on one another. Walker argues that the jury could have interpreted the reference to "snitching" to mean that Walker or Decker was a police informant, which infers that Walker was engaged in prior criminal activity. There was no evidence presented to the jury that Walker or Decker was a police informant. Rather, the testimony was introduced to show motive based on why Walker and Decker did not get along. Therefore, the testimony was proper. MRE 404(b)(2) (stating that evidence of a prior crime may be admissible to prove motive). Because this testimony was proper to show motive, the assertion that Walker's trial counsel was ineffective for failing to object to this testimony is without merit.

¶42. Second, Walker asserts that his trial counsel should have objected or moved to redact the portion of his police interview where he stated that he had been to jail for "[s]imple possession." "[I]t is not per se prejudicial to a defendant if a jury simply hears an isolated instance of a crime or bad act in the course of a trial." *Brown v. State*, 890 So. 2d 901, 913 (¶35) (Miss. 2004). Further, the Supreme Court has held that when "the other crimes evidence admitted was of the same type as that with which the defendant was currently charged, the prejudicial effect would be great." *Parker v. State*, 606 So. 2d 1132, 1137 (Miss. 1992), *overruled on other grounds by Goff v. State*, 14 So. 3d 625, 662-63 (¶162)

16

(Miss. 2009)). However, where "the other crimes evidence . . . was attempted possession of marijuana," and the defendant "was on trial for murder," "[t]he prejudicial effect, if any, would be minimal." *Id.*

¶43. Again, Walker's admission that he had been in jail for simple possession gave the jury a complete picture of why he and Decker did not get along. Near the conclusion of Walker's interview, Detective Glass asked him the following line of questions:

> Q. Was there ever anything said about either you snitching on him at some point or him snitching on you over something in the past?
>
> A. He supposed to had snitched on me or whatever a while back, but I got all that behind me. That's well in the past. I left all that alone.
>
> Q. Okay. What was that over?
>
> A. I got a lot to lose. I mean, that's the last thing I want. That's been years, years since what I was talking about earlier.
>
> Q. Okay.
>
> A. I left that in the past.
>
> Q. And it wasn't—it was just the simple?
>
> A. Yes, ma'am.
>
> Q. Okay.

¶44. We cannot find that Walker's counsel was ineffective for not objecting to the mention of the prior crime or "snitching" because it was admissible to show motive and present a complete story to the jury. *See* MRE 404(b)(2); *Kirby v. State*, 379 So. 3d 915, 923 (¶14) (Miss. Ct. App. 2024) (finding on direct appeal that the failure to make an objection that "could have been reasonably expected to be overruled . . . cannot be characterized as

17

ineffective assistance"). Further, even if Walker's trial counsel should have objected to the admission of Walker's statement that he had been to jail for simple possession, we cannot find that any prejudice resulted from the jury's hearing this information at Walker's trial for murder. Therefore, this claim fails under *Strickland*.

### d. Hearsay Testimony

¶45. Walker argues that his trial counsel was ineffective for failing to object to Green's hearsay testimony that spots on Walker's clothing tested positive for blood. First, Green's testimony was not hearsay because it was not admitted to prove the truth of the matter asserted. MRE 801(c) (stating that hearsay is a statement that is not made while testifying at the current trial that is offered in evidence to prove the truth of the matter asserted in the statement). Rather, Green was relaying the investigation process, and "[s]tatements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Eubanks v. State*, 291 So. 3d 309, 322-23 (¶51) (Miss. 2020).

¶46. Further, after Green stated on direct examination that Walker's clothing had tested positive for the presence of blood, Walker's counsel elicited testimony from Green that although law enforcement learned that Walker's clothing had human blood on it, no testing was performed to determine whose blood it was. Specifically, Walker's counsel asked:

> Q. And what was the result, if any, of that analysis [of Walker's clothing]?
>
> A. Positive for blood and all samples collected by the lab on the articles of clothing.
>
> Q. Okay. Positive for human blood?

18

A.     Correct.

Q.     Okay. Were there any further analysis done on these items to determine whose blood it might have been?

A.     No.

¶47.   Regardless, no prejudice can be shown from Green's testimony because Walker admitted that he stabbed Decker while they were in close contact, and he acknowledged in his interview with Green, which was played for the jury, that he had "a lot of blood on him." He also admitted it was human blood. He stated, "I don't know if some of it his [(Decker's)]. I don't know if some of it is mine. But I know it's a lot of blood."

¶48.   Given that Green's testimony was not hearsay and that Walker himself admitted that he had human blood on his clothing, Walker's counsel was not ineffective for not objecting to the State's questioning or in eliciting this testimony on cross-examination. Therefore, no ineffectiveness has been shown as to this argument.

¶49.   Walker also argues that his trial counsel failed to object when Green stated that he based his opinion regarding whether Walker acted in self-defense on his "communication with other people." However, this testimony was not hearsay because Green never testified as to any specific out-of-court statement. Rather, he was explaining that he formed his opinion after investigating the crime scene and talking to eyewitnesses. Again, because Green's testimony was not hearsay, Walker's counsel was not ineffective for not objecting to it. *See Galloway*, 122 So. 3d at 639 (¶52); *Kirby*, 379 So. 3d at 923 (¶14).

### e.     **Improper Bolstering**

¶50.   Walker argues that his counsel was ineffective for failing to object to the State's

19

improper bolstering of his interview with law enforcement. After Green testified regarding his interview with Walker, the State was permitted to play an audio recording of the interview without objection. The State published copies of a transcript of the audio to the jury to use while the recording played, again without objection. After the audio concluded, the State moved to introduce the audio recording and transcript into evidence as exhibits. Walker's counsel did not object to the introduction of the audio recording into evidence, but he objected to the introduction of the transcript, arguing:

> Our position [is] that the transcript . . . the jury has in its possession now is for the purpose of assisting them and understanding what the audio recording says. I think that it would be cumulative and perhaps confusing for the jury to have both the transcript and the recording in the jury room during deliberations.

¶51. The circuit court allowed the transcript to be entered in evidence, finding, "I don't think it's harmful to either side for the transcript to be admitted into evidence and then to refer to it at a later date." The circuit court instructed the jury, "To the extent you heard something different in the recording than what is contained in the transcript, you are to rely on what you heard not what the transcript says." The transcripts were then collected from the jurors.

¶52. "The Mississippi Supreme Court and this Court have repeatedly approved of the practice of allowing jurors to have transcripts of a recording as long as an appropriate cautionary instruction is given." *Piccaluga v. State*, 337 So. 3d 1142, 1156 (¶64) (Miss. Ct. App. 2021) (collecting cases). The circuit court gave a cautionary instruction, and Walker's counsel objected to the introduction of the transcript into evidence as an exhibit. Walker has not shown that his counsel was ineffective on this issue.

20

### 3. Failure to Provide Discovery or Talk to Witnesses

¶53. Under this assignment of error, Walker contends that his trial counsel was ineffective for failing to provide discovery, including a witness list. Walker contends that he was prejudiced by his counsel's failure to provide discovery because his witnesses, particularly his mother, were not allowed to testify.

¶54. After denying Walker's motion for a directed verdict after the conclusion of the State's case-in-chief, the circuit court asked the defense how many witnesses it intended to call. Defense counsel responded, "Possibly three main defense witnesses and two character witnesses." Defense counsel then admitted, "We've had some difficulty, hadn't even talked to one of the witnesses." Counsel for the State then responded, "I don't know who those five witnesses are, but we haven't been discovered any witnesses, other than the names of two witnesses, one of which I got 30 minutes ago." The State further expressed concern that the jury was not asked any questions on voir dire regarding Walker's mother because the defense did not disclose her as a potential witness. Defense counsel admitted to not responding to discovery requests. The following exchange then occurred:

> [STATE]: Your Honor, I have absolutely nothing of what any of these witnesses, other than Mr. Beene might testify—well, let me say this. I have been told what two of them may say. I have absolutely no discovery on Ms. Walker. I know she was subpoenaed, but again I've been told consistently that she would not be testifying and that is the reason, or part of the reason, that they weren't voir dired. We voir dired on all of our witnesses and the defense did not ask questions about any witnesses.
>
> [DEFENSE]: Who told you she wouldn't be a witness?

| [STATE]: | Both of you. |
|---|---|
| [DEFENSE]: | We did? |
| [STATE]: | Yes. |
| [DEFENSE]: | I'm getting feeble, I don't remember. |
| [DEFENSE]: | Judge, that being the case, we would—I have had discussions with [counsel for the State] concerning the content of the two character witnesses, that they would be asked two questions each. Mr. Beene was in fact a witness who was tendered to us by the State and was placed under subpoena by us when we may or may not call. *The defendant's mother, we would withdraw her from consideration as being called as a witness based on—* |

(Emphasis added).

¶55. Defense counsel did not finish his sentence regarding why the defense withdrew Walker's mother as a witness, and Beene was not called by the State or defense as a witness. Regarding his mother's testimony, Walker asserts on appeal that she was presumably withdrawn due to the discovery violation. Further, because Walker's mother was voluntarily withdrawn as a witness, no proffer was made as to her expected testimony or how it would have impacted Walker's defense, if at all. Nor was it disclosed whether the defense would have called any other witness but for the discovery violation.

¶56. In *Pelletier v. State*, 207 So. 3d 1263, 1268 (¶23) (Miss. Ct. App. 2016), this Court found that where the record was not "clear as to why [a defense witness] was not disclosed to the State in a timely fashion or what exactly he might have said had he been able to testify," this Court was unable to review the claim of ineffective assistance on direct appeal.

22

We found that "[p]ut simply, the claim is not 'based on facts fully apparent from the record,'" and, therefore, the claim was more appropriate for review through a motion for post-conviction relief. *Id.*

¶57. We find the record before us is insufficient to examine this issue. Therefore, we deny relief without prejudice to Walker's right to pursue this claim in post-conviction collateral proceedings.

## CONCLUSION

¶58. The State did not improperly comment on whether Walker would testify, and Walker has failed to show his counsel was ineffective for failing to give an opening statement or failing to object to certain testimony. As to Walker's assertion that his counsel was ineffective for failing to respond to discovery, we find that the record is insufficient to address this issue, and we deny relief without prejudice for Walker to raise this issue in post-conviction collateral proceedings. Walker's conviction and sentence are affirmed.

¶59. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY AND ST. PÉ, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**